We're happy to hear argument in our first case, number 12-1515, the Chesapeake Bay Foundation v. Weyerhaeuser. Good morning, Your Honor. Jack McKay on behalf of the appellants. Your Honor, the district court in this case decided summary judgment really wearing blinders. It looked at only three pieces of evidence and concluded that as a matter of law there was either notice actually implied and also included... Can you talk up just a tad? Talk up a little bit? Yes, ma'am, I will. I'm sorry. Okay, thanks. I apologize. He looked at only three pieces of evidence and decided as a matter of law that there had been both notice of the fact of damage and the cause of damage. We believe when this court looks as it's obligated to do and able to do at the entire record, you will see numerous issues of disputed fact that require reversal. Those three pieces of evidence were the following, Your Honor. There was the fact that there was leakage into the building early after construction was complete. There was a 2001 report from Wisgeny and there was the 2002 report from Vaughan. That is essentially all the district court looked at in making its findings. It looked at no context with respect to those reports and looked at nothing that would raise any inference contrary to the inferences that it drew. I would like today to give you context for those reports to show you how the court erred and what it did. Before I go into the reports themselves, I think it's important that we have some definitional discussion because there are words and terms floating around here that I think sometimes confuse the district court in his findings. There are many references in the reports to the word façade. Façade is the exterior of the building. In this particular application, the façade, the exterior wall, has parallelams protruding through that and continuing into the building. You have basically what's called, I think, an echoskeleton outside the wall. Then you have the wall, the façade, and those parallelams continue through the wall into the interior. We have a picture at page 610 of the joint appendix of the building, which has been copied so many times that it was blurred. We gave the court references yesterday to online sites where you could find a better picture of the building. It's basically this echoskeleton outside with parts of that echoskeleton continuing inside the building through the façade. There's also the use of the word sealant in many places. Sealant was the material that was placed around that point where the exterior parallelams entered the building to keep water from entering the building. There are also references to pressure treatment. Pressure treatment here was important because the parallelams are going to get wet. Given their mode of manufacturing, which, Your Honor, is basically taking thin strips of wood, putting glue between them, and then microwaving them, there are voids created. There are long runs in the product that will naturally let water in. So pressure treating was important. Pressure treating involved putting the parallelams in a vat of preservative under pressure and treating them to a certain level of absorption. Unfortunately, in this case, that level of absorption was not reached, and that's really what the case is about. I'm sorry, what did you just say? The level of absorption was not reached that was certified, and that's what the underlying issue is in the case. In other words, they couldn't absorb as much water as they said they would. They didn't absorb as much pressure of the preservative as was certified. Okay. It was of the preservative. CETOL is also referenced in the documents, and that is a surface sealant that's put on the parallelams in the field. It has nothing to do with preservation. Its purpose is to avoid UV deterioration from sunlight. And the last thing that I think we need to define is the difference between leaks and rotting, and I think the district court confused those two consistently in its opinion. This building had leaks. Water came down the parallelams and into the building. The sealant that was to stop it did not work. That's a totally different issue from whether the parallelams themselves were rotting, whether they had some defect in them and the pressure treatment that was causing them to decay. But the district court repeatedly referred to the leakage as part of the reason why it found that there was notice as a matter of law. But ultimately, both of those were caused by water, and I guess the judge seemed to think it intuitive that if you've got leaks where water gets into the parallelam or the structure, invariably you're going to have rotting. That seems intuitive to me. Well, you might have rotting, Your Honor, if you didn't have pressure treatment. That's why the pressure treatment is applied here because everyone knows these parallelams are going to get wet because of the way they're structured. That's why you have pressure treatment. So the fact that water was running down them and then entering the building says nothing more than that water was entering the building. It says nothing about the deterioration. If there had been proper pressure treatment, these things, despite the fact that they would have taken water and would have gotten wet, people knew that if there had been proper pressure treatment, there would never have been any evidence of issue of decay. But getting wet is not the same as the inside of you getting wet. You know, I go outside in the storm and it hasn't gotten my heart wet. Your Honor, that's correct. Do you take my point? Yes. I mean, I understand I'm not a parallelam, whatever they are. But I think that you do yourself a disservice by saying that as I understood your papers, this stuff that we're talking about the building was made of does get water inside it. It does, yes, Your Honor. That's how it's made. So when you say it's just not like a brick that the water bounces off, water gets inside it. That's right. I don't know bricks. That's what I was trying to say. It's not like a fence post you might go buy at Home Depot. Water actually gets in it because it has these voids. It's supposed to do that. Everybody knows that will happen. So what caused, in your view, the leaks in the building was because the separation between these was not firm enough? Is that what happened? The sealant where they entered the building was not firm enough to keep the water. But that was their separation between them and some other device. It wasn't within the parallelam. Parallelams. That's right, Your Honor. It was the protection. The water came in because there wasn't adequate sealant at the facade, at the wall, to keep the water from entering the building. Which was the place where they met something else. Where they met the exterior wall, and, Your Honor, where they extended through the exterior wall. I'm sorry. I interrupted you. Oh, no, no. That's fine. I was just going to – I mean, the district judge in this case seemed pretty confident about the fact that any reasonable person in your client's position should have had noticed both actual and inquiry as to the rotting in this case. And I think one sentence in his opinion sort of sets out what his view is. He says at page 22 of the memorandum opinion that to reiterate, just about anyone who has ever stained a deck knows that cracked, waterlogged wood stands to rot. What's wrong with that? Well, that's, first of all, a factual finding based upon his experience. That's a determination. Okay. Well, let's just assume we all think it's right. That that is right. Well. Do you lose? No, Your Honor, because – Well, why not? Because if water gets wet and water leading to rotting is not an issue of the preservatives property. There was no evidence of anything other than wetness in this whole period of time. See, I think I thought from your papers, but I'm not getting that here in oral argument, is that you regard the substance with which this stuff is made is different – so it's fundamentally different from wood rotting as we think of it because water does – it is supposed to get within the body of this substance. That's true, Your Honor. In a way that wood does not.  It's not supposed to do that. Would not enter in the same way that it would in wood, but if it does enter, it does enter if there's not treatment. At some point, as it happened here, this parallelum rotted, but there was no reason to be concerned about water getting in. And I take your point, there was no reason to be concerned about water getting in because that's how these products were made. And, Your Honor, I think we can't lose sight of the fact that there was never any evidence whatsoever that there was decay or rotting ever seen in these parallelums before 2009, and we filed suit in 2010. And I think the best evidence of that is to look at the testimony of the warehouser representatives. This is a unique case in the sense that the warehouser representatives, the seller and supplier and the expert, was on site for three years looking at these parallelums trying to decide how to deal with the water problem. Well, do you need actual knowledge that the wood was rotting or at least some indication to put you on inquiry about the need to investigate? Your Honor, you would need some indication, but there was no indication here other than a few random statements from the WisJetty report. I mean, I go back to you still haven't, at least in my mind, resolved the question that Judge Diaz put to you, and I had thought I understood the way you resolved it in your papers, but you haven't said that this morning, so maybe I've misunderstood your papers. Your Honor, let me try again. Okay. This is a different product than wood. Wood does not have voids in it as this product does. Therefore, there was nothing surprising that this wood was getting wet. Inside of it? Inside. And that's why it was to be pressure treated. And therefore, the fact that it was wet, and someone might think that wet wood rots, as the district court found here, has no bearing on this case because everyone knew this was going to get wet, and it was going to get wet unless it would remain wet. So the fact that we saw wet wood tells you nothing. And, Your Honor, coming back to my point. Doesn't wood get pressure treated, too? Some does. That keeps the water out. I thought pressure. That keeps the water from entering from the outside. Here we have voids that allow the water to enter naturally. That's what I thought was the difference. That's the difference. That's the different matter. You do have pressure treatment. So go back to part of the district court opinion that Judge Diaz was asking you about. Well, wet wood rots, I think is what Diaz said. Not just wet wood. He said cracked waterlogged wood. So there are two components there that at least suggest to him a duty to inquire. Well, Your Honor, if you talk about the cracking, you see that the reports talk about cracking at the column joints, which is where it entered the building. That's a problem. He ignored the complete context of the report. The cracking was where it entered the building. I think the best evidence that there was nothing to be seen here, Your Honor, was that the warehouser was there for three years and said that they saw no evidence of deterioration, they saw no evidence of decay, they saw no reason to be concerned about the parallel's longevity. What were those three years? 2001 to 2004, exactly the time that we were supposed to have had notice because of the report. That makes this case unique among any of the cases I think that either party cited because no one has a case where the manufacturer, the expert, they developed this product. They knew this product. It was their product. No other case has evidence where they had exactly the same knowledge and, Judge Diaz, they had the same reports. They had the same reports. They had the same exposure, and they were the experts, and they testified that they saw nothing. If they saw nothing, how could we be on any kind of notice with respect to deterioration of the parallel? We were on notice with respect to the leaks, but that's a different issue. And I think you can only draw two inferences from the fact of warehouser's knowledge. Either there was nothing to be seen, and therefore the appellants could not be held to have either actual or implied implicit knowledge, or that warehouser knew and they lied. In either case, those decisions go to the jury. And that is where the judge erred in this case. I think if the court would look at Would the statute of limitations issue go to the jury then? Yes, it does. That's my point. That's what you're saying. That goes to the jury. Yes, that goes to the jury. That's very clear in the Maryland law. The Pils case surveyed many Maryland cases and talked about how difficult it was to get summary judgment where notice was an issue under the Maryland statute of limitations. So you're not making the claim that it's a matter of law. You didn't have notice until Well, Your Honor, I would argue that I don't have to Well, you've already given that up. I don't have to succeed today on that. I just have to Well, you do have then a bifurcated trial. Oh, Your Honor, he could if he wished to take evidence on that. But the fact is it's a jury question. That's all I have to convince you of today. I wanted to invite the court's attention to just one document in the record because I think it sort of captures the problems with the district court's approach to this case. And it also tells us how the appellees are arguing this case. If the court looks at Joint Appendix 261, which are notes of a phone call that Mr. Vaughn had with the appellants three days before his report, district court paid no attention whatsoever to page 261, to those notes. Where on 261? I'm going to point it out for you, Your Honor. The appellee's site, if you look about three quarters of the way down, you'll see in all caps, SERIOUS PROBLEM, which is what they cite. Are we on 261? J.A. 261. Okay. See that series of handwritten notes? Yeah, I see those. Do you see the entry P. Wiley, underscored? It's just above that to the right. It says, WRONG MATERIAL FOR THIS APPLICATION, SERIOUS PROBLEM, all caps underlined. That's right. That's what the appellee's site. And there's three words down below that. And those words are important because there's an error connecting the two. Those are SICK BUILDING SYNDROME. SICK BUILDING SYNDROME. That's the interior leakage, the mold, the problems that come from a sick building. Your Honors, let me just move very quickly. Look above that to the entries that were made on this call with Mr. Vaughn three days before his report. AS GOOD AS A RAILROAD TIE, GOOD DURABLE PRODUCT, PRESSURE TREATING IS GOOD, WILL NOT ROT FOR A LONG PERIOD OF TIME. THE PROBLEM IS MIXED POST AND BEAMS THAT PASSES THROUGH THE ROOF CONCERNED ABOUT MOLD. IF YOU TAKE THAT DOCUMENT AND LAY IT AGAINST THE PORTIONS OF THE VAUGHN REPORT THAT THE DISTRICT COURT RELIED ON TO GIVE NOTICE, I THINK IT CAN ONLY REACH THE CONCLUSION THAT THERE ARE DISPUTED ISSUES OF MATERIAL FACT THAT ARE EPITOMIZED IN THAT ONE DOCUMENT. Before you sit down, sir, so what do you glean from this document? I glean that Mr. Vaughn was addressing the problem of water leaking through the building. That's what the serious problem was. That was the question about raw material for this application. What was the raw material? He's raising a question or at least making a statement perhaps that it was the raw material for this application. Serious problems. But look at the qualification. The qualification is sick building syndrome. So what he was addressing was that the wrong product for this application given the fact that there were leaks into the building. What does that mean, sick building syndrome? That's mold. That's the whole mold idea that you have a problem with a building that you can't get rid of because it's got mold. I'm sorry, you're going to have to context this a little bit for me. What do you draw from this? First of all, who was this written to? These are notes by Mr. Truby, I think, of the Chesapeake Bay Foundation. These are notes of a phone conversation that Mr. Vaughn had three days before he issued his report. Okay. And they're made by Mr. Vaughn? No, they're made I think by Mr. Truby, Your Honor. They're made by one of the appellants. One of the appellants. Yes, and they're relied on by the appellees in this case for the quotation about serious problem. So tell me what your argument is. My argument is that the district court took the Vaughn statement that there was a problem, a serious problem. He also took the statement that the Paralympics were not protecting the building. He ignored, first of all, with respect to the leakage problem. He ignored the fact that this was addressing leakage. This was addressing the sick building syndrome. That's why there was a question about whether the Paralympics were appropriate. It had nothing to do with rotting. By leakage, you mean where these parallel... Paralamps enter the building. Or met something else. Met the facade and entered the building. So my first point is that what this shows is that Vaughn's report and his whole project was addressing the leakage problem. That's what he was hired for and that's what he looked at. So that's my first point. My second point is that you can't take the Vaughn quote out of context without looking at these statements that he made three days before he wrote his report about it being a good, durable product. It would not rot for a long time. That there was no problem with... that the pressure treating was good. And you have to combine that with testimony that he said he saw nothing on site that indicated any problem with the Paralympics. And the person with whom your client had the conversation, Vaughn, the expert, has he testified in deposition? He did, Your Honor. And he testified that he saw nothing at deposition. It's in the brief. His testimony was consistent with this. He saw nothing that was any problem with the Paralympics except where they entered the building. So you've got... I take that evidence. So you've got a potential conflict here, an initial cause of concern in the report itself, but something that contradicts it. But doesn't that then put your client on inquiry notice to find out what... No, Your Honor, it doesn't. ...what this expert is concerned about? I think it creates an issue of fact, I would say. I can explain the conflict if you wish me to, but if you accept that it's a conflict, it raises an issue of fact that we get to have decided by a jury. It doesn't put you on notice as a matter of law. Well, the report... Doesn't your client talk to Weyerhaeuser? We sent the report to Weyerhaeuser. They dismissed it, saying there is no problem. And that's what the district court rejected throughout with any consideration of what Weyerhaeuser did because he made the astounding factual determination that simply because of the statements in the reports that he relied on that we should have known as a matter of law that Weyerhaeuser was lying. And therefore, we couldn't rely on anything they said or did. You should have known they were lying? Yes, that's what he said. You should have known that the misrepresentations were false. That's what he said. Thank you very much. Yes, Your Honor. Mr. Stedman. May it please the court. Good morning. Good morning, Your Honors. My name is Tracy Stedman, and I'm here on behalf of Appali Weyerhaeuser. Respectfully, Your Honors, if that were the end of the story, we probably wouldn't be here today. Okay? What would be the end of the story? If there was a dispute of facts, we wouldn't be here. What I'm saying is… Your expert has not disclaimed this account by their client, right? That's not borne out by the facts, Your Honor. All the facts before you in the record are undisputed. That's one thing that appellants forgot to say. Well, this entire piece of paper, then, is undisputed, but it contains facts that go both ways, shall we say. Well, okay. Let's say in that May 24, 2000 report that Vaughn issued after he made conflicting statements, right? In that report, he said the pressure treatment along with the three-coat system has failed to keep the wood protected. So what he's saying is even if it's treated and even if it's coated, it's not working. And not one appellant went back to Vaughn and said, hey, three days before this, you said something different. What did your client do? Your client had this report, right? Yes, but my client has no duty to investigate this report. My client is not the expert, the appellant. And your client just said that it was not worth – your client sold this product to them, right? Sold the Paralamb. Right, right. And your client didn't think it was worth investigating it? My client's not under a duty to investigate under their inquiry notice. But I hear your argument, but I asked you a direct question whether your client thought it was worthwhile investigating it. Often when you – even if you don't have a duty, if you have a customer, you like to keep the customer happy. But your client didn't think there was any need to do that here. What my client said was we felt it unproductive and unnecessary to respond to this report. That's what they said. And there's not anything in the record after that fact that – What the evidence was that your client said this guy didn't know what he was talking about? Chesapeake Bay Foundation, in their testimony, said that Weyerhaeuser said Vaughn doesn't know what he's talking about. But we have to take the facts in the best light for them on summary judgment for you, right? So you can't just ignore their testimony and say the facts are undisputed. Well, I'm not ignoring that fact. But what I am saying is – Well, you were ignoring it until HDS brought it to your attention. What I am saying is there's not a single case that supports appellant's position that they're entitled to continually and blindly rely on Weyerhaeuser assurances when they're in possession of not one but two experts' reports that are contradicting the information or the so-called assurances that my clients are given. If you look at Pills v. FDIC, if you look at DeGroff v. Lancaster Silo, and if you look at Poffenberger v. Risser, which are the cases that appellants cite for the entitlement to rely, not one of those plaintiffs sought outside expert help. Not one of those plaintiffs got contradicting information that they got from the defendants. Here, the appellants hired not one but two experts. Claiming that Weyerhaeuser's involvement in this case somehow changes the conclusion is a red herring because, like I said, Weyerhaeuser, after May 24th, okay, let's say after June 10th, 2002, the letter that says we feel it unproductive and unnecessary to respond to that report, there's not anything in the record that says Weyerhaeuser told them the Paralim was fine, that the Paralim was not suffering. They were silent, and absent a confidential relationship, the defendant is not required to disclose anything, number two, absent a confidential relationship, there has to be more than mere silence to support a claim for fraudulent concealment. So, Your Honor, the question of diligence. We agree with the law. It says when a court cannot find notice... They have a claim other than fraud here, do they not? They have what? Their sole claim is not one of fraud. They have other claims. Correct? Yes. Okay. So, they have... Well, they also say that somehow appellants are off the hook when they have expert reports that identify defects, but don't recommend a fix to that problem. And now that position is debunked by Pyramid Condominium Association versus Morgan, where in that case, the Plaintiff Homeowner Association hired not one, but four experts over a period of several years. The U.S. District Court found in that case that limitations began to run on the first expert report, where that expert report said, I see defects, and I recommend a further investigation, which is exactly what Wisjani said. Wisjani said there may be a problem with the treatment, there may be a problem with the coating. You need to do a further investigation. And if we're going into definitions of what the coating and things are supposed to do, the Cetol in this case, which is a three-coat system that's applied after the preservative is applied, is the coating that's supposed to keep the wood from absorbing water. So yes, the wood will get inside the buoys and the splits, but it's supposed to be wicked out. The wood is not supposed to absorb the water, and that's exactly what Vaughn said in his report. He said he was concerned about the high content of the moisture of the pear limbs, and he also said he was concerned about rotting over time. And in his deposition testimony, he said the high moisture content said the Cetol coating is failing to protect the wood. Nothing appellant said after that could change those facts. How many more red flags do appellants need? I mean, they met during the month of May 2002 at least three times to discuss the pear limb issue, and during that time is when Vaughn said, I'm concerned about rotting. He came out with an expert report later that contradicted what he said on May 21, 2002, but not one appellant went to him and said, Vaughn, what do you mean? Same thing with Wisjani. They did not ask either of their experts about the specific observations that they were making about the problems with the pear limb. So, Your Honor, that appellants continue to claim that somehow Weyerhaeuser hid these expert reports or hid these facts from them or somehow they were kept so ignorant of these claims is implausible given the notice inquiry standard. I mean, inquiry standard doesn't require omniscience. It doesn't require knowledge of all the claims. It actually requires appellants to be aware of their surroundings. They cannot have people, experts, looking at the building constantly and ignoring the actual pear limbs that are the structural component of the building and are the vehicle for the water to get in. Do I understand the facts correctly that this problem, whatever it was, was cured in some fashion? The leak stopped, is that right? Yes, the water leaking into the building. And how did that stop? What happened? You don't know from the record? Usually when I argue the case, I always told young lawyers, it's your obligation to know the case better than anybody else in the courtroom. And I'm sure you do. And so you don't know from this record how it stopped? I don't know. God came down? No. Over a period of years, Wisjani was there through 2004. What do you say? Over a period of years, Wisjani was there. Wisjani? Wisjani was their first expert, the building envelope expert. Okay. And Vaughn was the wood expert that they hired. Right, but the experts don't cure the problem. No, but Wisjani was there helping solve the problem. Now, however, that problem, I think they might have added flashing at the joints where it did the building, but it was all about stopping the water from getting into the building through the pear limb. And so at that point, they stopped. Through the meeting. The meeting with the facade. Right. From that point on, the building was dry, but they ignored the fact that the pear limbs were still absorbing water. And, Your Honor, I will tell you this. Although it's not highlighted in the brief, it is supported in the record that in late 2002 and early 2003, Chesapeake Bay Foundation was looking for attorneys to bring a claim against their architect Smith Group. And Chesapeake Bay Foundation was also negotiating a settlement agreement with Clark Construction because of the defects on the project. And this is in the record somewhere? It is in the record. It's at JA 428 to 434, Your Honor. You mentioned red flags, Counsel, and just so that I'm clear as to how many red flags do you say there were in this case that put the building at least on inquiry notice? The two reports, right? Inquiry notice from the first report. The first report is Wisjani, May 8, 2001. That expert was hired to evaluate the long-term durability of the pear limb, and that expert noted defects in the treatment and the coating and recommended investigation. Okay. But, of course, there's evidence indicating that he also said that it would look fine and wouldn't rot for a long time. Or am I talking about the second expert? That's the second one. Okay. Is there any contradictory evidence with respect to the first expert that at least poses a conflict, even if, as you say, it doesn't absolve the appellant of at least making inquiry? Right. Even in the face of fraud, red flags, you can get on notice. It doesn't matter what the issue is. There were treatment certificates that were provided to appellants that certified treatment to a certain level, but those were provided prior to Wisjani's report in May 8, 2001. So then you flash forward to May 2002. The leaking is continuing. Wisjani is still on the project. They're meeting on a regular basis. The appellants are discussing their reports. They're on the project all the time trying to stop the leaking into the building. Then in May 2002, they talk three times at least on the phone or in person. Vaughn Woodworking is hired as a wood expert, not Weyerhaeuser. The contention that they said they solely relied on Weyerhaeuser as their expert is not supported by this record because they hired not one but two experts to look specifically at the long-term durability of the Paralamp. During that time, Vaughn also said they all discussed Paralamp as an issue. Paralamp needs additional study. Vaughn was concerned about the high moisture content of the Paralamp. He took readings when he inspected the building, and he said, I'm concerned about freezing and rotting over time. So the issue is not one appellant followed up with him, even in the face of contradicting information with respect to what Weyerhaeuser was telling them or with what their own expert was telling them. And to say that those contemporaneous statements, which were three days before, somehow can gloss over the statement that he said, the pressure treatment and the coating system have failed to protect the wood, I think is specious. I mean, the inquiry notice only requires appellants to be aware of their surroundings. And diligence, we agree with the law on diligence. Diligence, if a court cannot find notices of matter of law on an indisputed facts before it, then and only then does the question of diligence and reasonable get to the jury. In Sasso v. Kohler, which involved an attorney-client relationship, the U.S. District Court specifically stated that the question of diligence must be decided on the facts of each case. The key questions are whether the plaintiff could have tried to get the information or had enough information to look further. And once the plaintiff has enough information to look further, the failure to do so is the failure of their claims. Courts routinely find, when they find notices of matter of law, that the plaintiffs failed to use diligence. That's how they get to, if you used diligence, then you would have found your claims. And not one of these appellants went back to either of their experts specifically regarding the Paralamp issue. You can look at Sasso v. Kohler, Bank of New York v. Sheff, this court's 2012 decision, and Brown v. Neuberger-Quinn, where they all say the failure to exercise diligence is the failure of their claims. So the court does, in fact, decide the question of diligence. How does this issue of polling impact the diligence question? The appellants argue that your clients hid information that would have given them actual notice that there was a problem with the way this wood was treated and or sealed, and that as a result any statute of limitations was told during the operative period. What's your response to that? Fraud does toll limitations, but only to a certain point. I mean, even in confidential relationships where the duty to inquire is relaxed and the plaintiffs in those cases are entitled to more blindly follow a doctor or their lawyer once they have enough facts in front of them to be a suspicion. And I say that these reports, if anything, were kind of like a gnat in their ear because they kept hiring experts to look at the Paralamp issue. So I say at the time that the May 24, 2002 report came out and specifically said, okay, it's treated and it's coded, they were on notice to do something at that point in time because for two and a half years the building was leaking and people were noting and they were talking specifically about the Paralamp. And as Judge Duncan wrote in this court's decision, Brown v. Neuberger-Quinn, nothing excuses a negligent plaintiff from the diligence requirement even if fraud is allegedly well disguised. I mean, the purpose of fraud is you take pains to disguise it. And there's nothing in this record, Your Honor, that shows that Weyerhaeuser committed any fraud. Actually, the record supports the fact that Weyerhaeuser didn't comment on the second report and it supports the fact that they said, okay, that guy doesn't know what he's talking about, but for the next one and a half or two years on the project they said nothing about how the Paralamps looked. And silence in this particular situation cannot support fraudulent concealment. It has to be more. And so fraud by its nature, you know, plaintiff's notion that allegedly concealed fraud excuses the need for any diligence on their part after they receive the report would permit statutory periods to be told indefinitely even when plaintiffs should have brought a claim. And so, Your Honors, looking at the undisputed facts of this case, if plaintiffs, if appellants, had diligently investigated or at the very least followed up with their own experts about not only their experts' concerns and observations, but their own concerns about the Paralamp, the same information that was discovered in 2009 would have been uncovered in 2002. And, Your Honors, appellants can't completely abdicate their responsibility to protect their rights. Let me ask you about, and I'm going to quote this language from one of our admittedly unpublished decisions, because you indicate and you present some evidence in the record to support the notion that the appellants had reason to suspect that something was wrong, but we have said that even when plaintiffs have some reason to suspect they may have a claim that the Maryland courts  especially when a plaintiff has relied on the defendant's or some other skilled person's assurances that there was not a problem. How do you get around that? Well, what I said earlier was about the four cases that they cite to about relying for assurances. In none of those cases did one of those plaintiffs seek outside help. Well, let's just take it that the judge has accurately characterized the case that he quoted to you. And go from there and try to answer that question. Okay, well, the Maryland courts routinely grant summary judgment on those issues. You just say we were wrong in that case. No, he said they were hesitant to grant. Well, that's what you said. Right. It doesn't mean that they don't grant. This would be this exceptional case when they would grant it. They're hesitant to, but they would grant it here. In this particular case? Yes. Well, it's more than hesitant. We've said that they've been unwilling to resolve the notice issue as a matter of law when an appellant has relied on the defendant's or some other skilled person's assurances that there was not a problem. Right. I understand that. But I think what the cases also say is you're only allowed to rely on that defendant or that skilled person's up to a certain point. when you have contradicting evidence that's coming from two experts that you hired to give you the information that you're seeking. All that sounds like it's for a jury to figure out what you just espoused. Well, when you look at the… You're allowing it up to a certain point, but then if you have this coming in, you've got to… The cases that have decided notice as a matter of law, even in the face of fraud, do make that decision. That's not a resolution. If they look at the facts in front of them and say, okay, the plaintiff… And there was fraud. In this case, the record does not reflect that there was actual fraud on the plaintiff's part or that they even made assurances after the May 24, 2002 date. And so the cases that have found fraud make that decision. At what point should Go Computer have known that Bill Gates was lying to him on the phone? At what point did Plaintiff Homeowners Association should have known that bad things were happening? At what point should Brown have found the final red flag that put them on notice that they should have discovered the fraud? What is the case, the Maryland case, that you say is closest to this one where the court granted summary judgment as a matter of law on a statute of limitations? I would say it's the Pyramid Condominium Association v. Morgan that involves water infiltration into a condominium building. And the reason I say it's closest is because it's construction-related. And the Homeowners Association hired not one, but four experts. In this case, they hired not one, but two experts. In that case, the court found that limitations ran on the receipt of the first report. And that first report said it identified defects in the condominium and it also recommended further investigation, which is exactly what Wisjani did in this particular case. But was there any contradictory information in those reports that suggested perhaps there wasn't a problem? In the Pyramid? No. There wasn't any other assurances. It doesn't lay off quite with this case, does it? I understand your point, Your Honor. But I would like to remind the court that Weyerhaeuser is not under the duty to act on the basis of those reports. Now, the appellants are under the duty. Under the cases, they can't abdicate their responsibility to protect their rights. So it appears from this situation that they were saying they're getting information and trying to pass the ball to Weyerhaeuser, which is not what the law requires. What Weyerhaeuser knew at the time or what Weyerhaeuser did is not at issue. It's what appellants did or didn't do and what appellants knew or didn't know at the time. And so the court correctly found that they were at least on actual notice, no later than May 24, 2002, and I don't believe the lower court limited its investigation to these particular reports because if you look at footnote 1, the district court says that they've looked at the record and there's some evidence that appellants cite to that doesn't support their assertion. So, for instance, when they assert that Weyerhaeuser determined that these reports were unfounded, the record does not support that. When they assert that Weyerhaeuser was well aware that the apparel lambs were not properly treated, the evidence they cite to does not support that. So, Your Honors, if there's any other questions, I would submit that affirmance under... I would remind the court also that they can find a firm summary judgment on the record before them, even if it's different grounds, as long as it's supported by the record. And I'll also say that affirmance of summary judgment here is completely consistent with the policy behind limitations, statutes, and the discovery rule for protecting defendants against untimely action. Thank you. I will start with the last thing that Ms. Stedman discussed, which is this issue of diligence and who had the duty to act. We went to Weyerhaeuser after the first report. Weyerhaeuser gave a fix. They gave us a new sealant to put around where the apparel lambs entered the building. We went to Weyerhaeuser after the second report. They told us that it was of no consequence. My point with respect to the reports and the knowledge is that Weyerhaeuser had exactly the same information that we had, and they said nothing. And I would invite the court to look. Her response to that seems to be they had no duty to say anything. No, but even if they had no duty, the evidence is in the record that they saw nothing. And, Your Honor, she would find that at 594, 605-07, and 687. They said they saw no deterioration. These are the Weyerhaeuser representatives who were there for three years. They saw no deterioration. They had no reason to be concerned about the apparel lambs. And as Judge King asked, that's in the very same period where we are charged with being unnoticed. So you can put the whole issue of their duty to speak. I'm just looking at the facts. Are you saying they did speak then? They didn't speak then. In deposition testimony, though, they testified that they saw nothing and had no concerns at the time they were there in 2003. Your argument is how can we be unnoticed? They conceded that there is nothing to put anybody on notice. Exactly. How can we, if you put the whole issue of fraud aside, if they saw nothing and they manufactured this product, they created it, they sell it across the world with brochures that are in the record, how can we be unnoticed if they saw nothing and said they had no concerns and I've given the court the sights to that fact? And you would accept, for purposes of that argument, that they didn't have any obligation to tell you anything. But after the fact, I mean, accepting it for the purposes of that argument. I will. Yes, Your Honor. For the purposes of the argument, it doesn't make any difference. It's just an issue of fact about what was visible. They saw nothing, but apparently you didn't see anything, but you have this report that at least is a cause for concern. What do you do in the face of that? Your Honor, they had the same report. We went to them and talked about it. They said it was of no concern. You said the report was of no concern. They said the report was of no concern. It was not worth commenting on is what they said. It would not be productive for them to comment on it. But I think, Your Honor, that we have to look at that Vaughan report. I gave you one contextual component, which was that page 261, the notes the day before. But you need to look also at Mr. Vaughan's testimony beyond what was in the notes of 261, that he saw nothing to indicate that the pressure treatment was not working. That's at 666. That he suggested cladding the Paralamps only where they entered the building, at the facade wall, because he saw no need elsewhere. That's at 669. And if you look at the report itself at 264, you will see that his discussion of shrinking and swelling of the Paralamps, his concern there is it's causing problems at the interior column joints. That's again, that's the leak problem. The sealant can't hold because there's expansion and contraction of the Paralamps. Those are all leak problems. Those are not problems with decay. And with respect to the, and Your Honor, I hope I described to you how the Paralamps work. There are vertical Paralamps on the outside in this so-called structure on the outside. The skeleton. There are vertical columns there. Then there are horizontal columns. And those horizontal columns pass through the facade, through the wall, into the building. And that's where the leakage problem was. And that's why I argue that it's not relevant to whether the Paralamps themselves were decaying. Your Honor, if I look at Maryland law, Pyramid is really not particularly on point because there's nothing to indicate that there was any contradictory evidence in the record. But if you look at the Maryland law and the cases from this court that come from Maryland, if Mr. DeGroff could stand there for six years and see his silo leaning and has neighbors coming up to him saying, John, that silo's leaning, and he's going back to the manufacturer and saying, I think there's a problem with my silo, he was not held to have notice until the silo was taken down and cracked concrete was found in the foundation. Same thing is true with respect to Colony that was decided by this court. In Colony, the property manager had tenants complaining about water leakage, about wet rugs, about mold, about mildew, about ceiling tiles falling. And this court said that it was an issue of fact for the jury about whether what the manager did in response to that was reasonable. She really did nothing. She waited until several years until she got more complaints and a report. Does it matter that, as your opponent suggests, you all were a little bit more sophisticated than the average tenant? It does not, Your Honor. And we pointed that out in the case that we cited as additional authority on, I think, Monday of this week. That's the Matthews case. That's a very recent case out of the Maryland Court of Appeals, which said that the trial judge had erred when he said, basically, this man is not a neophyte in real estate, although he's a school teacher. He has invested in real estate for 40 years. And I'm offended, and I think the jury would be offended, by trying to say this man is not sophisticated. The Court of Appeals said that was an error because determining sophistication is a matter of determining credibility, and that's for the jury. In this case, the jury is entitled to hear that our clients, while they may be sophisticated in protecting the Chesapeake Bay or in designing buildings or in building buildings, the jury is entitled to hear that they have no particular sophistication in this product or in how it should be treated. So it's a credibility determination that the appellees are arguing for, which the Maryland Court of Appeals says cannot be done. Thank you very much. We will come down and greet the lawyers and then go directly to our next case.
judges: Diana Gribbon Motz, Robert B. King, Albert Diaz